UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GARY CEDERQUIST,<br><br>　　　　　　　Defendant. | Case No. 24-cr-10024-IT-1 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

For virtually his entire tenure in MSP's CDL Unit, Gary Cederquist was the ringleader, organizer, and principal perpetrator of a criminal enterprise. He took bribes. He extorted members of the public. And he falsified records. Over and over again, for years. Cederquist's conduct jeopardized the safety of everyone on the roads and highways of Massachusetts (and beyond) every time he took a bribe in exchange for a free CDL, falsified a score sheet, input fake scores into the RMV's computer system, or forged a sponsor's signature on an application. Disguised as an upstanding member of law enforcement, Cederquist demonstrated a willingness to trade his badge and police uniform for the oddest and greediest array of material goods: a new driveway, a snowblower, a mailbox, premium bottled water, and Swedish fish. He was found guilty of all of this by a jury of his peers, and his sentence must reflect the nature, extent, and gravity of his criminal conduct – as well as the terrifying potential consequences of what he did.

For the reasons set forth below and to be articulated at the sentencing hearing in this case, the government respectfully submits that a sentence of 108 months of incarceration, 24 months of supervised release, a fine of $30,000, restitution in the amount of $18,300, forfeiture as charged in the indictment, and the mandatory special assessment of $100 per count

is appropriate in this case and for this defendant.  Such a sentence would be sufficient, but

not greater than necessary, to satisfy the sentencing objectives of 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

Gary Cederquist started his career with the Metropolitan District Commission Police

("MDC") in 1987.  PSR ¶ 21(a).  In 1992, when MDC merged to form the Department of State

Police, Cederquist became a trooper in the Massachusetts State Police ("MSP").  *Id*.  In 2017,

Cederquist was promoted to sergeant, and he served as sergeant in charge of the CDL Unit from

August 2017 until February 2023, when federal agents executed a search warrant at the CDL

Unit's administrative offices and Cederquist was transferred into MSP's Supply Section.  *Id*.  He

retired in January 2024 and was later dishonorably discharged.  *Id*.

In his role in the CDL Unit, Cederquist was tasked with administering the three-part CDL

skills test, which included a pre-trip inspection, the Basic Control Skills or "maneuvers" portion,

and a road test.[1]  PSR ¶ 15.  Cederquist was required to administer and score each portion of the

test for each CDL applicant and – only if the applicant passed all three portions of the test –

stamp the applicant's CDL permit and enter the applicant's truthful scores into a computer

database called "CSTIMS."  *See id*.  As the sergeant and commanding officer of the unit,

Cederquist also supervised other troopers, including Trooper Calvin Butner, Trooper Perry

Mendes, Trooper Joel Rogers, and Trooper Matthew Davis.  PSR ¶ 21.

As the Court is well aware, the CDL road skills test is designed and approved by the

Federal Motor Carrier Safety Administration and the American Association of Motor Vehicle

---

[1] For a more detailed background on CDL testing and MSP's CDL Unit, the government adopts and refers the Court to Paragraphs 10 through 22 of the Presentence Investigation Report ("PSR").

Administrators. PSR ¶ 10. And it is challenging by design to ensure that only qualified drivers receive licenses to drive heavy and dangerous trucks on the road. Indeed, the overall pass rate for tests administered by the defendants and conspirators in this case was just 33%.[2] PSR ¶ 26. The vehicle inspection test involves identifying and explaining dozens of parts and functions of a Class A or Class B vehicle. PSR ¶ 15(a). The Basic Control Skills section requires the driver to successfully complete a series of difficult maneuvers in the vehicle. PSR ¶ 15(b). And, finally, the road test involves the applicant driving the truck on the road – with the trooper-examiner in the passenger seat – for approximately 25 minutes and with very specific requirements. PSR ¶ 15(c).

### The "Golden" Conspiracy

Over a three-year period, from at least as early as May 15, 2019 until January 5, 2023, Cederquist conspired with his subordinates, including Troopers Butner, Mendes, Rogers, and Davis, to provide false passing scores to CDL applicants connected to Cederquist and other members of the CDL Unit. PSR ¶ 25. Together, they agreed that certain applicants – whom they called "goldens" – would receive guaranteed passing scores on their CDL skills test even if they took an incomplete test, took and actually failed the test, or, in some cases, never took the test at all. PSR ¶¶ 25-26. Indeed, all of the applicants deemed "goldens" by Cederquist (and his co-conspirators) received passing scores on the test. PSR ¶ 26.

For example, three applicants for whom Cederquist coordinated the "golden handshake" were John Cruz, Peter Cakridas, and Charles Daley[3]:

---

[2] During the conspiracy, Cederquist's individual pass rate was 46%.

[3] The names of these applicants were introduced at trial, either because they testified or otherwise. *See, e.g.*, Ex. 263 (summary chart identifying applicants by name).

- **John Cruz** – On June 30, 2021, Cruz – who had known Cederquist since childhood – drove his pickup truck (not a CDL vehicle) at Cederquist's direction to meet Cederquist in the Brockton RMV parking lot. According to Cruz, who testified at trial, he filled out only the "Applicant Information" section of his application, signed it, and gave it to Cederquist. At the Brockton RMV parking lot, Cederquist did no more than walk around Cederquist's pickup truck. Cederquist then stamped Cruz's learner's permit and said he had passed. At some point thereafter, Cederquist forged the signature of Barry Rotberg in the "Sponsor" section of the application, entered false information for a tractor and trailer, and indicated that Cruz had taken and passed all three parts of the skills test. Cederquist also fabricated from whole cloth a score sheet for Cruz and, on July 1, 2021, accessed CSTIMS and falsely reported that he had administered a skills test to Cruz, that Cruz had driven a Class A vehicle during the test, and that Cruz had passed all portions of the test. Thereafter, Cruz received a Class A CDL in the mail. In reality, Cruz never took a CDL skills test. PSR ¶¶ 57-59.

- **Peter Cakridas** – On January 3, 2022, Cakridas – whose father was a friend of Cederquist's and who Cederquist referred to as a "[g]ood guy" – arrived at the Stoughton testing site to take his CDL road skills test with Butner. As Butner tested Cakridas, who performed only one of the three required maneuvers during the test, Butner texted Cederquist, "He's a mess Class A truck 2psi loss with truck running cut ou[t] again while timing," followed by four "laughing-crying" emojis. Moments later, Butner informed Cederquist that Cakridas had "passed" the test. Cederquist replied with a "fireworks" emoji. Butner later accessed CSTIMS and falsely reported

4

that he had administered a full skills test to Cakridas, indicating that Cakridas had

driven a Class A vehicle and had passed all portions of the test.  Thereafter, Cakridas

received a Class A CDL in the mail.  In reality, Cakridas never took a complete CDL

skills test and, in fact, failed the test.  PSR ¶ 28(b).

- **Charles Daley** – On February 3, 2022, Daley – whose "friend or relative" owned a
  clothing store and, according to Cederquist's texts to Butner, "takes care of the police" –
  arrived at the Stoughton testing site to take his CDL road skills test with Butner.  As
  Butner tested Daley, who performed only two of the three required maneuvers during
  the test, Butner texted Cederquist, "Total mess this guy".  Butner later accessed
  CSTIMS and falsely reported that he had administered a full skills test to Daley,
  indicating that Daley had driven a Class B vehicle and had passed all portions of the
  test.  Thereafter, Daley received a Class B CDL in the mail.  In reality, Daley never
  took a complete CDL skills test and, in fact, failed the test.  PSR ¶ 28(c).

To be clear, Cederquist's orchestration of, and affirmative participation in, the "golden"

conspiracy were not random or isolated incidents.  The balance of the evidence, much of which

was introduced during trial, demonstrates that golden handshakes were a regular part of doing

business for Cederquist and his CDL Unit in Stoughton.

### The Cederquist-Camara "Truck Team" Conspiracy

Cederquist and his subordinates also conspired to give the "golden treatment" to fellow

members and employees of MSP, including four troopers from MSP's Commercial Vehicle

Enforcement Section or "Truck Team."  Specifically, Cederquist conspired with Scott Camara, a

manager at a truck driving school, to give passing skills test scores to the four Truck Team

troopers, all of whom testified at trial. The four troopers made appointments to take their skills tests at the Stoughton testing site, two on October 5, 2021, and two the next day. PSR ¶ 31.

On October 4, 2021, Cederquist texted Camara to confirm he was bringing "the truck" to the Stoughton test site the next day. Exh. B at 46. When the troopers arrived for their tests on October 5 and 6, they all experienced the following: there was no Class A truck at the site, no sponsor was provided or present for any of the trooper-applicants, and none of the four troopers took a real skills test. PSR ¶¶ 32-36. Instead, Cederquist introduced the troopers to Camara and told them they would drive a truck – without a trailer (a requirement for a Class A test and license) – owned by Camara's employer; none of the troopers took the air brakes test; none of them performed required maneuvers inside the marked lanes and cones (some performed zero maneuvers); and none of them performed the road test with Cederquist in the passenger seat. *Id*. Rather, each of them sat in the truck cab with Camara, drove around the yard for a bit, and then went out on the road with Camara. *Id*. One of the troopers testified that it was the first time he had ever driven a truck with a manual transmission and, at one point, he was doing so poorly that he and Camara had to switch seats.

On October 6, 2021, Cederquist texted Camara, "Don't forget the trailer info." Exh. B at 50. Camara replied by "laughing" at Cederquist's message and sending a meme as if to say, "What am I, an idiot?" *See id*. On October 6, Camara entered false trailer information on the troopers' applications and also signed as each trooper's sponsor. PSR ¶ 37. Cederquist copied the false trailer information onto the troopers' score sheets. He also wrote that he had administered each trooper's test, and he entered completely fabricated passing scores on all of the test segments for each trooper. Cederquist then entered that same false information into CSTIMS and added another piece of false information: that they had taken and passed the air

6

brakes test.  PSR ¶ 38.  As a result of these false representations, each of the troopers received a CDL entitling them to drive a Class A vehicle with air brakes and a manual transmission.  *Id*.

### The Devens MSP Employee Conspiracy

From January 31, 2022 to February 9, 2022, the CDL Unit's lead trainer, Trooper Davis, trained five MSP employees on how to take and pass a Class A skills test.  PSR ¶ 42.  The training took place at a facility at Fort Devens in Ayer, Massachusetts.  *Id*.  In part because Davis, as the trainer, could not test applicants he trained, Cederquist and Davis agreed that Cederquist would go to Devens to "test" the applicants at the end of their training.  PSR ¶ 43.  In reality, Cederquist and Davis knew that Cederquist would not actually test the applicants.  *Id*.

In the end, Cederquist went to Devens and briefly sat in a truck with one of the applicants.  He did not administer tests to any of the applicants.  Cederquist then fabricated passing scores for all five MSP employees and, on February 8-9, 2022, he entered the false passing scores into CSTIMS.  PSR ¶ 43.  All five applicants later received Class A CDLs in the mail.  *Id*.

### The Cederquist-Mathison Water Company Bribery and Extortion Scheme

From October 2018 to November 2021, Cederquist also orchestrated and participated in a scheme through which he accepted and extorted inventory from Eric Mathison, an employee of Belmont Springs, who delivered truckloads of products to Cederquist at the Stoughton CDL testing site and at his home.  During the three years of this conspiracy, Cederquist demanded, and Mathison provided, thousands of items from Belmont Springs' inventory in exchange for preferential treatment on CDL tests, from "cutting the line" to schedule appointments to providing false passing scores for applicants who did not take complete skills tests or who actually failed the test.  PSR ¶ 46.

7

Through the duration of this conspiracy, Cederquist and Mathison exchanged at least hundreds of messages in which they texted about (1) CDL applicants and testing, and (2) Belmont Springs inventory for Cederquist. *See* PSR ¶ 24; Exh. A.[4]  In furtherance of the scheme, Mathison would bring applicants to the Stoughton testing site for their "tests" and serve as their formal sponsor.  PSR ¶ 48.  At least several drivers whose applications were sponsored by Mathison and whose tests were either administered or supervised by Cederquist actually failed their test but, nevertheless, received a passing score from Cederquist – and, ultimately, their CDL.  PSR ¶ 48.  On at least one occasion, immediately after a Belmont Springs employee took only a partial skills test (for which he later received a passing score and, therefore, a CDL), Mathison loaded a delivery of Belmont Springs products directly into an MSP cruiser.  *Id.*

In their text messages, Cederquist openly remarked about the poor performance of certain Mathison-sponsored applicants, and they likewise joked about various "orders" placed for Belmont Springs products.  *See* PSR ¶ 48; Exh. A at 335-45.  On more than one occasion, Mathison delivered Belmont Springs inventory to Cederquist's residence, also in Stoughton. *See, e.g.*, Exh. A at 656-61.  On no occasion did Cederquist, or anyone at MSP, pay for the thousands of dollars of Belmont Springs merchandise delivered to the Stoughton CDL testing site or to Cederquist's home.

### *The Cederquist-Rotberg "Stream of Benefits" Bribery and Extortion Scheme*

After getting to know each other at the Stoughton testing site, Cederquist and a frequent CDL sponsor named Barry Rotberg reached an agreement in which Cederquist would help get

---

[4] Exhibit A, annexed hereto, is a copy of text messages exchanged between Cederquist and Mathison during the course of their bribery and extortion conspiracy – entered into evidence during trial as Exhibit 246.  Due to file size constraints, this exhibit cannot be uploaded to the ECF system but will otherwise be provided to the Court and counsel.

CDLs for people connected to Rotberg in exchange for Rotberg providing various "home improvements" to Cederquist.  PSR ¶ 49.

In March 2021, Rotberg requested Cederquist's help in getting a CDL for a colleague at Newport Construction, where Rotberg worked.  PSR ¶ 32(a).  Cederquist did so and subsequently told Rotberg that he wanted the shrubs in front of his house replaced with plants. *Id*.  Rotberg then arranged for that to be done by a landscaping company.  *Id*.  Cederquist did not pay Rotberg or anyone for this landscaping work.

In May 2021, Cederquist told Rotberg that he wanted a new driveway installed at his house.  PSR ¶ 32(b).  Rotberg arranged for a company based in Dighton to excavate Cederquist's existing driveway and for a new driveway to be installed.  *Id*.  The owner of the Dighton-based company enlisted the help of his son, Willie Perreira, to pick up the asphalt needed for Cederquist's new driveway; however, transport of the asphalt required a CDL, which Perreira did not yet have.  *Id*.  When Rotberg informed Cederquist of this problem, Cederquist directed that Perreira drive the CDL truck to pick up the asphalt and indicated that he would take care of Perreira's CDL.  *Id*.  Perreira followed Cederquist's instructions, and the new driveway was installed at Cederquist's house.  *Id*.  In exchange, Cederquist entered fabricated information into CSTIMS to get Perreira a CDL, including scheduling a fake test and false information about Perreira's purported passing score on the test.  *Id*.  Cederquist also fabricated a score sheet for Perreira.  *Id*.  After the installation of the driveway, Perreira received an unrestricted Class A CDL in the mail.  *Id*.  Cederquist did not pay anything to anyone for the driveway, which was valued at approximately $10,000-$12,000.  *Id*.

In January 2022, in advance of a predicted blizzard in Massachusetts, Cederquist told Rotberg that he wanted a new snowblower.  PSR ¶ 32(c).  At the time, Rotberg was acquainted

with a hardware store owner whose son was looking to obtain a CDL.  *Id*.  Rotberg went to the hardware store, where he ultimately purchased a new snowblower valued at $1,911.44.  *Id*. Rotberg delivered the snowblower to Cederquist's house.  *Id*.  Approximately two weeks later, Cederquist administered a CDL skills test to the son of the owner of the hardware store.  *Id*. During the test, Cederquist texted Rotberg that the applicant was "horrible" and "brain dead." *Id*.  Cederquist proceeded to give the applicant a passing score, and the applicant later received a Class A CDL in the mail.  *Id*.  Cederquist did not pay anyone for the snowblower.

Cederquist requested additional items from Rotberg, including a storage shed and a plunge pool, which Rotberg did not ultimately provide to Cederquist.  PSR ¶ 32(d)-(e).

### *The Mailbox Honest Services Fraud Scheme*

In August 2021, Cederquist and Thomas McGrath, an old gym acquaintance and owner of a fence company, ran into each other at a diner near both the Stoughton testing site and McGrath's business.  PSR ¶¶ 52-53.  Cederquist told McGrath that he was in charge of MSP's CDL Unit, and McGrath told Cederquist he was trying to obtain his CDL.  PSR ¶ 52.  Cederquist told McGrath he could help but that he also wanted a new granite post and mailbox for the end of his (new) driveway.  *Id*.  On October 15, 2021, two of McGrath's employees installed a new granite post and mailbox, valued at approximately $750, at Cederquist's house.  PSR ¶ 54.  On November 17, 2021, McGrath went to the Stoughton site, where he did not take a complete skills test.  PSR ¶ 55.  Cederquist subsequently falsely reported in CSTIMS that McGrath had taken and completed a Class A skills test, including the air brakes test.  *Id*.  McGrath later received an unrestricted Class A CDL in the mail.  *Id*.

## PROCEDURAL BACKGROUND

On January 21, 2024, a grand jury returned a 74-count indictment against six defendants, including Cederquist.  Cederquist was charged in Counts 1-3 with conspiracy to falsify records, in violation of 18 U.S.C. § 371; Counts 4-6 with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951; Counts 7-9 with extortion, in violation of 18 U.S.C. § 1951; Counts 10-15 with honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346; Counts 16-34 with falsification of records, in violation of 18 U.S.C. § 1519; Counts 44-46 with falsification of records, aiding and abetting, in violation of 18 U.S.C. §§ 1519 and 2; Counts 47-63 with false statements, in violation of 18 U.S.C. § 1001(a)(2); and Counts 71-73 with false statements, aiding and abetting, in violation of 18 U.S.C. §§ 1001(a)(2) and 2.

While all five co-defendants pled guilty to various charges in the indictment or otherwise entered into an agreement with the government, Cederquist proceeded to trial on April 14, 2025. On May 2, 2025, the jury returned a verdict finding Cederquist guilty on 48 of the 57 counts with which he was charged: Counts 1-5, 7, 10-15, 17-33, 45-46, 48-62, and 72-73.  Cederquist was acquitted of Counts 6, 8-9. 16. 44. 47 63, and 71.

## DISCUSSION

### I.    Sentencing Guidelines Calculation

As a preliminary matter, the government concurs with the defendant's offense level, criminal history, and Guidelines Sentencing Range ("GSR") as calculated by the U.S. Probation Office ("Probation") and detailed in the Presentence Investigation Report ("PSR") in this case. Specifically, the government agrees with Probation's assessment of the base offense level (14), as well as the following enhancements:

- USSG § 2C1.1(b)(1) (offense involved more than one bribe or extortion),

- USSG § 2C1.1(b)(2) (the value of what the public official obtained exceeded $6,500),

- USSG § 2C1.1(b)(3) (offense involved a public official in a high-level decision-making or sensitive position),

- USSG § 2C1.1(b)(4) (defendant was a public official who facilitated the obtaining of a government identification document), and

- USSG § 3B1.1(a) (defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive).  PSR ¶¶ 74-85.

As calculated by Probation, the defendant's Total Offense Level is 30 and his Criminal History Category ("CHC") is I, resulting in a GSR of 97-121 months.  PSR ¶¶ 85, 89-90, 118.  In addition, Probation has computed the Guidelines range for supervised release to be one to three years and the range for a fine to be from $30,000 to $300,000, in addition to a mandatory special assessment of $100 per count, or $4,800.  PSR ¶¶ 122, 127-28.

The defendant did not file any objections to the PSR.

## II.    Sentencing Recommendation

The government's recommended sentence – specifically 108 months of incarceration, 24 months of supervised release, and a $30,000 fine – is the reasonable and just outcome in a case where the defendant, a sergeant in the State Police entrusted to uphold the laws of the Commonwealth, spearheaded multiple conspiracies to extort, accept bribes, and falsify records. This recommended sentence is particularly appropriate where the defendant and his co-conspirators perpetrated a fraud on the public that, inarguably, put everyone on the roads and highways of Massachusetts at risk.  And not only did Gary Cederquist do this, month after month, but he joked about it by text message with his co-conspirators, took measures to carefully conceal the conduct, and did not stop until he got caught.  In short, a significant sentence of

incarceration – indeed, a sentence in the middle of the Guidelines – would accomplish the goals of Section 3553(a) and would be no longer than necessary to do so.

Pursuant to 18 U.S.C. § 3553(a), the Court is required to consider a series of factors when determining an appropriate sentence. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing; "the kinds of sentences available"; the Guidelines range itself; any relevant policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant. Taken together, the considerations enumerated in Section 3553(a) – in particular, the nature and seriousness of the offenses of conviction, the need to promote respect for the law and impose just punishment, and the importance of general deterrence – weigh in favor of a sentence that includes the significant period of incarceration recommended by the government.

## A. The Nature and Circumstances of the Offenses Warrant a Sentence of 108 Months

First, the Court must consider the nature, circumstances, and seriousness of the offense, combined with the need for a sentence to promote respect for the law and provide just punishment. 18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A). Here, in light of the scope, the substance, and the manner in which Cederquist conducted himself, the government submits that

13

the nature, circumstances, and seriousness of his offenses warrant a sentence of 108 months of incarceration.

As a threshold matter, Cederquist held a position of indisputable public trust and was expected to hold himself to a standard of honesty and moral certitude as a member of the Massachusetts State Police.  Unlike roles in the private sector, Cederquist held a position requiring a rightfully elevated level of integrity.  By directing and playing an active role in multiple years-long conspiracies to give guaranteed and fraudulent passing scores to CDL applicants – including and especially by accepting bribes and extorting others in exchange – Cederquist utterly failed to uphold the values required for his position and violated the public's trust.  At bottom, the nature and circumstances of the conduct here speaks for itself: wielding the power of a State Police sergeant, Gary Cederquist transformed the CDL Unit into a criminal enterprise doling out commercial driver's licenses to his own friends and acquaintances, or to people willing to pay to play, as he alone saw fit.  He openly mocked applicants who proved they could not drive the trucks for which they sought licenses and, so long as they had the right connections or were willing to pay, made sure they got CDLs anyway:



And for applicants who had not bribed Cederquist or who did not have the right connections, Cederquist took pleasure in giving them failing scores:



The core dishonesty demonstrated by Cederquist, a sworn member of the Massachusetts State Police who held himself out as an upstanding law enforcement officer, is shocking and inexcusable.

Perhaps even more significantly, Cederquist's conduct, and that of his subordinate trooper co-conspirators, had an obvious, toxic effect on public safety in Massachusetts and beyond. As the Court is well aware, fraudulent passing scores meant that applicants who never proved they were qualified and capable of operating huge commercial vehicles received their Class A and Class B CDLs – and then could drive those vehicles on the roads and highways here and, as their CDLs allowed them to, across the United States. And as testimony from Troopers Davis and Rogers at trial demonstrated, no one understood the grave risks posed by large commercial vehicles better than the members of the CDL Unit themselves. In other words, Cederquist knew – perhaps better than anyone – the dangers posed by allowing unqualified drivers behind the wheel.

As the government has argued at previous sentencing hearings held in this case, no defendant is as culpable as Cederquist: Cederquist ran the CDL Unit in Stoughton, supervised every other participant in the golden conspiracy, made sure that troopers on the Truck Team and MSP employees who trained at Devens got their licenses, and was the only member of MSP to engage in a series of additional bribery and extortion schemes. Cederquist's conduct in the "golden conspiracy" alone demonstrates a blatant disregard for the safety of everyone on the roads and highways of Massachusetts. But he did so much more.

As discussed above, if a CDL applicant did not have the right "connections" to Gary Cederquist or other members of the CDL Unit, there was another way to get a free passing score on the skills test: they could buy their way in. Barry Rotberg testified extensively about the favors and preferential treatment Cederquist provided in exchange for literal bribes. In one instance, he arranged for a brand-new driveway, valued at $10,000-$12,000, to be installed at Cederquist's house. In what may have been the most egregious quid pro quo described at trial, one of the workers tasked with delivering the asphalt for Cederquist's driveway did not have a CDL at the time; to ensure the driveway could be completed, Cederquist directed that the delivery proceed regardless, and he fabricated passing test scores to (literally) pave the way for a CDL to be issued. That worker, Willie Perreira, received a Class A CDL in the mail without ever taking a test, and Cederquist's driveway was installed without delay:



Of course, that was not all Cederquist got from Rotberg and others, like Eric Mathison and Thomas McGrath.[5]  Cederquist also got landscaping work at his house, a brand-new snowblower delivered before a blizzard, unlimited snack and beverage deliveries from Belmont Springs, and the satisfaction of knowing that if he ever needed something, all he had to do was ask – and continue providing guaranteed passing scores on CDL skills tests.

While Cederquist's new driveway may have been the single most valuable item Cederquist received in exchange for a CDL, the Water Company conspiracy in some ways was far more extensive.  Over the course of this scheme, Mathison delivered truckloads of premium bottled water, boxes of coffee pods and tea, brand-new coffee and drink machines, and candy, like Twizzlers and Swedish Fish, to Cederquist, both at his work trailer in Stoughton and at his house.  In turn, Cederquist provided passing scores to Belmont Springs CDL applicants, including to applicants who never took an actual test – or who, in some cases, failed it.

To be clear, Cederquist did not demand just one or two items every once in a while.  He regularly texted Mathison detailed lists of what specific products he wanted delivered:



---

[5] With respect to the mailbox provided by McGrath and snowblower provided by Rotberg, the jury acquitted Cederquist on Counts 6 (extortion conspiracy), 8 (extortion), and 9 (extortion); however, the jury found Cederquist guilty of both the mailbox-for-passing-score and snowblower-for-passing-score quid pro quos with guilty verdicts as to Counts 14 and 15 (honest services mail fraud).

17

Cederquist's greed knew no bounds.  The sheer quantity of Belmont Springs inventory and individual deliveries comprising the stream of benefits Cederquist received from Mathison runs well into the thousands of both items and dollars.  As his text messages with Mathison demonstrate, Cederquist was communicating about deliveries of Belmont Springs products week in and week out: hundreds of these texts were introduced at trial, and they provided uncanny insight into the nature of this bribery and extortion scheme.  Exh. A.  Photos of deliveries Mathison placed inside Cederquist's trailer at MSP's Stoughton testing site likewise speak volumes about the nature of this conduct:



By a conservative estimate, and relying only on photos of deliveries sent to Cederquist by Mathison and text messages describing specific deliveries, the total value of Belmont Springs inventory provided to Cederquist is over $8,300.  *See* Exh. C.

Consistent with his conduct as to all applicants who could not pass the skills test but for whom Cederquist arranged to get licenses, Cederquist talked about aspects of the scheme openly and casually and treated it as if it was all a big joke.  During one CDL skills test of a Mathison-connected applicant, Cederquist texted, "This kid's an idiot"; "No idea what he's doing"; and

"Dan [Mathison's boss] should be sending strippers," along with different emojis. Exh. A at 335-37. Cederquist's conduct here was so flagrant that he actually arranged for Mathison to have a key to the locked gate at the Stoughton CDL testing site, which Mathison utilized to make deliveries after hours. Regarding an apparent delivery of tea, espresso, Twizzlers, and Swedish Fish, Cederquist asked, "You have a key to the gate now, right?" Mathison responded, "Yes, I have a key to the gate." Exh. A at 103. Later that day, Mathison texted Cederquist a photo of his delivery of Belmont Springs products inside Cederquist's trailer at the Stoughton testing site, along with the messages, "All stocked up" and "Not bad. Not bad at all ha ha." Exh. A at 105.

As discussed further below, the nature and circumstances of Cederquist's conduct with respect to the "golden conspiracy" dwarfs that of his co-conspirators. Indeed, his elevated role in that conduct alone renders him in another category of offender. However, add to that the bribery and extortion schemes which he alone perpetrated – meaning without the participation of his trooper co-conspirators – and, the government submits, Cederquist graduates to a new level of culpability.

### B. General Deterrence Mandates a Significant Sentence

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court also must consider the need for the sentence to afford adequate general and/or specific deterrence to criminal conduct. Here, the government submits that the Court should be particularly concerned with general deterrence. Cederquist's brazen conduct, as demonstrated by evidence introduced throughout his trial, exposes the lengths certain members of law enforcement are willing to go to provide benefits to people with the "right" connections, to accept bribes in exchange for official acts, and to extort members of the public because they have power instilled by their position. By abusing his badge

and his public position, Cederquist committed crimes that erode citizens' trust in their public officials.

Particularly against the backdrop of recent police corruption scandals in Massachusetts, the conduct exposed in this case underscores the need for this Court to impose a sentence that takes general deterrence into account and sends a message that this type of criminal conduct by members of law enforcement will not be tolerated. A sentence that includes a significant period of incarceration is necessary to deter others similarly situated to Cederquist – that is, members of MSP and other members of law enforcement – who might be tempted to engage in a similar course of conduct. A sentence without a serious period of incarceration would not accomplish this goal. The government submits that a sentence of 108 months of imprisonment for this defendant will serve to generally deter others from contemplating or engaging in such crimes.

### C. Cederquist's History and Characteristics

Cederquist's history and characteristics also weigh in favor of a longer incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). Cederquist has had more advantages than most defendants who appear before this Court. As Probation notes in the PSR, Cederquist was raised in an economically secure environment, first in Middleboro and then in Bridgewater. He was not subjected to any kind of abuse as a child, grew up in what appears to have been a stable family environment, and has not had any kind of alcohol or substance-abuse issues. *See* PSR ¶¶ 95-104. As discussed above, for thirty-five years, Cederquist also had the benefit of a steady, well-paying job in law enforcement.

Unlike many of the defendants who appear before this Court, Cederquist has not struggled with poverty, addiction, or a lack of opportunity. While such challenges do not excuse criminal behavior, they sometimes provide context for criminal conduct. That is not the case

here.  There are no such mitigating factors in this case, and the defendant should be sentenced accordingly.

### D.  Proportionality

In recent police corruption cases brought in this district, defendants have received a range of sentences, generally commensurate with factors like whether and when they took responsibility for their conduct, whether they cooperated with law enforcement, whether they testified as a part of their cooperation, and – significantly, of course – the nature of the conduct itself.  To the extent it is helpful to the Court, particularly if Cederquist attempts to cherry-pick certain of these sentences in his own arguments here, the government has attached as an exhibit a chart of comparative cases, with case citations, crimes charged, GSRs, and sentences imposed.  *See* Exh. D.  This chart also includes a column describing factors that distinguish those cases from the instant case, of which there are plenty.

Here, Cederquist's conduct is easily distinguishable from those law enforcement defendants who received lesser sentences.  Indeed, his conduct may eclipse that of previous defendants by an order of magnitude.  In particular, and as discussed above, Cederquist's conduct is directly and inextricably linked to potentially dire public safety consequences.  Even compared to overtime fraud cases involving officers who did not show up to assigned public safety-related shifts or left shifts early, the criminal behavior here is in many ways more egregious: Cederquist's conduct put drivers behind the wheels of commercial vehicles when they never demonstrated they were capable of driving them (or, worse, demonstrated the opposite).  Unlike his co-defendants, Cederquist went far beyond the CDL Unit "Friends & Family Program" when he began accepting bribes and extorting members of the public in exchange for guaranteed passing scores or no-show CDLs.  And it was not just a one-off bad act or catching

21

him on his worst day: Cederquist spent years creating and administering a two-tiered system for CDL applicants, defrauding and endangering the public, and enriching himself. Put simply, Cederquist is the very embodiment of public corruption.

Beyond the District of Massachusetts, the relevant Judiciary Sentencing Information ("JSIN") data provides further support for a significant incarcerative sentence. During the past five fiscal years, 100% of similarly-situated defendants received a sentence that included prison time and, more importantly, the mean (and median) sentence for those defendants was 45 months. PSR ¶ 134. Here, Cederquist's GSR exceeds that average sentence; however, the government submits that a greater sentence is required due to both the scope of Cederquist's conduct (three different conspiracies to falsify records, two extortion conspiracies, six counts of honest services mail fraud, and dozens of additional substantive counts) and the fact that the public safety consequences are not accounted for in the applicable Guidelines.

Finally, with respect to proportionality, the government notes that it recommended fifteen months for Trooper Butner and twelve months for Trooper Mendes. As discussed above, the government submits that there really is no comparison: Cederquist's conduct warrants, proportionally, a far more serious penalty than either sentenced trooper co-defendant.

## CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 108 months of imprisonment, two years of supervised release, a fine of $30,000, restitution in the amount of $18,300, forfeiture as charged in the indictment, and the mandatory special assessment of $4,800. Such a sentence would be sufficient, but not greater

than necessary, to reflect the seriousness of the defendant's conduct and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date:  October 9, 2025          By:    */s/ Adam W. Deitch*
                                        CHRISTINE WICHERS
                                        ADAM W. DEITCH
                                        Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Adam W. Deitch*
Adam W. Deitch
Assistant United States Attorney

Dated:  October 9, 2025